# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ELIZIBETH MAYES, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 09-CV-278-JHP ) |
| WHITLOCK PACKAGING CORPORATION, a Domestic Corporation, | ) ) ) |
| Defendant. | ) |

## OPINION AND ORDER

Before the Court is Defendant Whitlock Packaging Corporation's Motion for Summary Judgment [Doc. No. 33], Plaintiff's Response in Opposition to Defendant's Motion [Doc. No. 39], and Defendant's Reply [Doc. No. 47]. For the reasons stated herein, this Court hereby **GRANTS** the Defendant's Motion For Summary Judgment.

## BACKGROUND

On March 31, 2008, the Defendant, Whitlock Packaging Corporation (hereinafter "Whitlock") hired the Plaintiff, Elizabeth Mayes, to work as an accounting clerk. [Doc. No. 2] Mayes was hired at Whitlock's Fort Gibson, Oklahoma, facility. Whitlock manufactures non-carbonated beverages and energy drinks. [Doc. No. 33]

Mayes has had petit mal seizures which is a form of epilepsy for 25 years. [Doc. No. 33-3] Her seizures are unpredictable and not controlled by the use of medications. [Doc. No. 33-3] When Mayes is having a seizure she is in a "seizure state" and does not know what is going on around her. [Doc. No. 33-3, pg. 9] She does not remember any of the events that happen during a seizure. At times, when Mayes is recovering from a seizure it appears to others that she is "back to full

1

consciousness and awareness" but she may still be in a dazed state and not fully conscious. [Doc. No. 33-3, pg. 10] Mayes is occasionally dazed and "might talk or answer questions after an attack but she doesn't remember it later." [Doc. No. 33-3, pg. 58] Through the years, Mayes believes she has found different things that have triggered her seizures such as hormonal imbalances, stress, fear, and rejection. [Doc. No. 33-3] Mayes explained that when she is feeling rejected or unwanted her seizures can be triggered. [Doc. No. 33-3] As a safety precaution, Mayes does not drive, she would not get up on a ladder alone, she would not go swimming or take a bath without someone present or nearby, and would not use the stove the same day after having had a seizure. [Doc. No. 33-3, pg. 15] Aside from the injuries she sustained while working at Whitlock, the Plaintiff has suffered other seizure related injuries such as falling down stairs, injuring her neck and back, and cracking her teeth.

Prior to being hired at Whitlock, Mayes informed the company she suffers from seizures. Whitlock did not require Mayes to walk into the areas of the facility where heavy machinery and equipment were being operated in order to retrieve paperwork for her job, but rather, had the necessary paperwork delivered to her as a safety precaution due to her seizures. [Doc. No. 33-3] Mayes handed out bookmarks to Whitlock employees which identified information regarding how to recognize symptoms of someone having a seizure and common first aid steps to follow. [Doc. Nos. 39-6; 33-3]

Mayes considered the environment at Whitlock to be stressful and felt feelings of rejection when her co-workers did not invite her to lunch with them. [Doc. No. 33-3] Mayes does not recall reporting feeling uncomfortable or rejected to the human resources department at Whitlock, although she believes she talked to Pam Webb, a human resources assistant and friend of hers, about her

2

feelings regarding Webb and another employee inviting her to sit at their lunch table. [Doc. No. 33-3] Mayes testified that she does not believe that Whitlock could have done anything else to make her feel more comfortable at work. [Doc. No. 33-3, pg. 53]

While employed at Whitlock, Mayes suffered approximately 15 seizures. [Doc. No. 33-3, pg. 39] Mayes stated that she never requested any accommodations from Whitlock regarding her seizures and nothing was required. [Doc. No. 33-3, pg. 40] During Mayes' first week of employment she was sitting at a table with another employee, Marie Bishop, and began having a seizure. During the seizure, Mayes began violently kicking the table such that Bishop had to move away from the table to avoid being kicked. [Doc. No. 33-7; Doc. No. 39, pg.4] During another instance Mayes suffered a seizure at Whitlock in the presence of employee Carol Chambers. [Doc. No. 33-8; Doc. No. 39, pg.4] During this seizure, Mayes hit her head, bled on the desk and floor and broke her glasses. Mayes' mother-in-law was contacted to pick her up from work. During another seizure Plaintiff looked at Chambers and said "help me." [Doc. No. 33-8; Doc. No. 39, pg. 4] When Chambers tried to help her, Mayes tightly grabbed Chambers' arm and dug her fingernails into her skin. Mayes left visible indentions in Chambers' arm.

On September 23, 2008, Mayes was terminated from employment at Whitlock. The day before, Mayes had experienced another seizure while at work. During lunch on September 22, 2008, Pam Webb and Marie Bishop were the only two employees present with Mayes. They were discussing a church sponsored event that was being planned between the churches the employees attended. During the conversation, Mayes began having a seizure and started to kick her legs and push her feet causing the chair she was sitting in to roll backwards. [Doc. No. 33-7] Webb claims she did not touch Mayes, but rather, put her hand on the back of the chair to keep her from moving

3

across the room. [Doc. No. 33-7] Mayes then bit Webb on the arm and retained her bite until she was twice asked to let go. [Doc. No. 2; Doc. No. 33-7; Doc. No. 33-6] Webb called Mayes' mother-in-law to pick her up from work. When Mayes returned to work the next day, she was terminated. The reason given for terminating Mayes was "violence in the workplace – bit co-worker" [Doc. No. 39-7]

## **DISCUSSION**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id.* at 249.

In considering a motion for summary judgment, this court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Gray v. Phillips Petroleum Co.,* 858 F.2d 610, 613 (10th Cir.1988).

In this case Plaintiff asserts claims against Whitlock under the American's with Disabilities Act (hereinafter "ADA"), 42 U.S.C. §12112(a), and Oklahoma public policy.

I. **AMERICAN'S WITH DISABILITIES ACT**

To succeed on an ADA claim, Mayes must show: "(1) she is disabled as defined by the ADA; (2) she is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) she suffered discrimination on the basis of her disability." *Hennagir v.*

4

*Utah Dept. Of Corrections*, 587 F.3d 1255, 1261-1262 (10th Cir. 2009), citing *Kellogg v. Energy Safety Servs. Inc.*, 544 F.3d 1121, 1124 (10th Cir. 2008). Each of these elements is essential to an ADA claim. *Id.* We conclude that Mayes cannot satisfy one prong of the ADA analysis, therefore, summary judgment for the Defendant is appropriate on this claim and without addressing the remaining elements. *Id*; *See also Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999).

Whitlock does not dispute that Plaintiff's seizures are a disability. However, as was the issue in *Jarvis v. Potter*, 500 F.3d 1113 (10th Cir. 2007), the issue in this case is whether Mayes is "otherwise qualified." "The ADA defines *qualified individual with a disability* as one who 'with or without reasonable accommodation, can perform the essential functions of the employment position.'" *Jarvis,* 500 F.3d at 1121, citing 42 U.S.C. § 12111(8). "In other words, one who cannot perform the essential functions of the job, even with a reasonable accommodation, is not an "otherwise qualified" individual." *Id.* The ADA contains a section entitled "Defenses" which sets forth appropriate qualification standards employers are permitted to use. It states in part:

> It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards ... that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation.
> 42 U.S.C. § 12113(a)

That section also provides a subsection entitled "qualification standards" which states that qualification standards "may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." *Id*. at § 12113(b)

42 U.S.C. § 12116 authorizes the Equal Employment Opportunity Commission (EEOC) to

promulgate regulations to implement provisions of the ADA. *Jarvis,* 500 F.3d at 1121, citing 29 C.F.R. § 1630.1-.16. The EEOC defines direct threat as "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r); *see also Jarvis*, 500 F.3d at 1121-1122 . This regulation further states:

> The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:
>
> (1) The duration of the risk;
> (2) The nature and severity of the potential harm;
> (3) The likelihood that the potential harm will occur; and
> (4) The imminence of the potential harm.
>
> *Id*.

"Courts generally have held that the existence of a direct threat is a defense to be proved by the employer." *Jarvis*, 500 F.3d at 1122 (citations omitted). There is an exception, however, to the general rule: "[W]here the essential job duties necessarily implicate the safety of others, then the burden may be on the plaintiff to show that she can perform those functions without endangering others." *Jarvis*, 500 F.3d at 1122 , citing *McKenzie v. Benton,* 388 F.3d 1342, 1354 (10th Cir.2004). The exception does not apply in this case since Mayes' essential duties did not "necessarily implicate the safety of others." *see Id.*

Although the standard suggests that the determination regarding whether an employee is a direct threat must be made based on an individualized assessment and reasonable medical judgment,

6

this requirement does not require the employer to obtain an independent medical examination to determine if the employee is a threat to others. *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1090 (10th Cir. 1997).

In this case, Mayes, by her own admission had experienced approximately 15 seizures during her time at Whitlock. Several of her seizures resulted in injuries to herself or others. Mayes also admitted that if a person approached her or tried to take something from her during a seizure she would likely become physically aggressive. She stated:

> Q: . . . What I am asking is, did you ever inform Whitlock Packaging or anyone there what to do if you grabbed ahold of them?
> A. Well, can I – I informed everyone as I gave them this, something like if I were to have this, or it's like I would tell someone, even if I was in a kitchen, even if this was a knife in my hand, the worst thing to do is to reach over and try to take this out of my hand. If you would like this to be out of my hand, pick up something very similar to this. Elizibeth, see this, and lay yours on the table and I will lay it besides yours.
> Now, if you reach over and try to take that from me, I will just fight you. The same thing if you were going to try to get me to sit down in my chair. If you have any physical contact and try to make me sit down in my chair or try to make me go out a door, I will just be physically aggressive and not let you do it because I am thinking that you are hurting me. If you want me to do that, sit down, pat the chair beside you, talking calmly, as it speaks in this, and I will sit down next to you. You need to show me what you want me to do and talk calmly and I will follow your guidance.

[Doc. No. 33-3, pgs. 49-50]

The Defendant contends that in light of Plaintiff's own admissions that she can be physically aggressive during a seizure as well as the observations the company made during the time Mayes was employed at Whitlock, it was appropriately concerned about "the welfare of all staff members within the department", and made the decision to terminate Mayes. [Doc. No. 39-11]

The Plaintiff contends that she distributed information concerning how to approach her during a seizure. Mayes contends that had Webb followed the instructions on the bookmark Mayes provided and not touched her or gotten too close, she would have never been bitten. Plaintiff essentially argues that if the employees had accommodated her by following the directions on the bookmark she handed out, her seizures would have posed no threat. The first aid bookmark Mayes distributed to Whitlock employees advises not to "grab hold" of a person having a seizure, it does not, however, advise persons to stay away from the person or to not touch them at all. [Doc. No. 39-6] The bookmark advises that if a person is having a seizure you should "remain nearby" and speak calmly to the person until the seizure ends. [Doc. No. 39-6] Although Mayes does not recall what happened during the seizure, she contends that Webb must have placed her hand on Mayes instead of on the chair as Webb recalls. However, in neither set of facts is it alleged that Webb "grabbed hold" of Mayes as warned against in the bookmark Mayes distributed.

Further, requiring employees to avoid going near Mayes while she is having a seizure in order to prevent any future violence is a burdensome and unreasonable request. In *Jarvis*, Mr. Jarvis, a postal worker, was fired after attacking a co-worker. He suffered from post traumatic stress disorder (PTSD) and alleged that if he could be accommodated by having his co-workers refrain from startling him, he would be able to keep from hurting them. *Jarvis*, 500 F.3d at 1124-1125. The Court held that the risk of a co-worker inadvertently startling him was present, and that the postal service was not required to prohibit his co-workers' daily interactions to accommodate that risk.

Such is the case here. Mayes' seizures have proven to be frequent, unpredictable, and violent. During one seizure, Mayes pled with a co-worker to help her. When the co-worker tried to help her she grabbed her arm and would not let go. During a seizure she has also kicked her legs

causing a co-worker in the immediate area to have to leave to avoid being kicked. In the incident with Pam Webb, she bit her because she was either touching her or touching the back of her chair. Whitlock should not be required to ignore the fact that Mayes' seizures are often dangerous to herself and those around her. Mayes' seizures have also proven to be unpredictable and if someone happens to be around her, there is potential for Whitlock employees to become injured. The law does not require Whitlock to wait for a serious injury before eliminating such a threat. *Jarvis*, 500 F.3d at 1124.

For these reasons, the Court finds that Defendant's Motion for Summary Judgment is **GRANTED** as to the Plaintiff's ADA claims.

## II.     OKLAHOMA PUBLIC POLICY

In the Plaintiff's Complaint, she states "Whitlock's action [sic] are a tortious violation of Oklahoma Public Policy as stated in the Fair Employment Practices Act." [Doc. No. 2] Defendant contends that this claim fails because the Fair Employment Practices Act (hereinafter "FEPA")[1], is part of the Oklahoma Personnel Act, which applies only to Oklahoma state and county employees. 74 O.S. §840-1.2. There is no dispute that Whitlock is a private employer and not subject to this act. In Plaintiff's Response to Defendant's Motion for Summary Judgment, Mayes argues that she meant to plead, instead of the FEPA claim, that Whitlock violated Oklahoma's public policy against employment discrimination on the basis of disability as established by *Burk v. K-Mart Corp.*, 770 P.2d 24 (Okla. 1989). Although the Plaintiff contends the Defendant has been on notice that this is what she meant to plead, the Defendant objects to allowing this claim as an improper amendment to the Complaint.

---

[1]O.S. §840.12(h)

9

Even if this Court were to allow the Plaintiff to proceed with the *Burk* tort claim despite her failure to plead it, this claim would still fail. The Tenth Circuit has repeatedly recognized that a Plaintiff's failure to establish a cause of action under federal discrimination claims is "equally dispositive of *Burk* claims." *McCully v. American Airlines, Inc*., __ F.Supp.2d__, 2010 WL 830273, *22 (N.D. Okla. 2010); E.g., *Brown v. Bd. of Regents*, No.09-6063, 2009 WL 4194299, at *3 (10th Cir. Nov.30, 2009) (unpublished); *Ruleford v. Tulsa World Publ'g Co.,* 266 Fed. App'x 778, 784 (10th Cir.2008) (unpublished); *Smith v. Okla. ex rel. Tulsa County Dist. Attorney,* 245 Fed. App'x 807, 818 (10th Cir.2007) (unpublished); *Malone v. MAPCO, Inc.,* No. 91-5073, 1992 WK 26788, at *1 (10th Cir. Feb. 11, 1992) (unpublished).

As such, Defendant is also entitled to summary judgment on Plaintiff's state law claims.

## **CONCLUSION**

For the foregoing reasons, the Court finds that Defendant's Motion For Summary Judgment is **GRANTED**.

**IT IS SO ORDERED** this 29th day of April, 2010.

_____
James H. Payne
United States District Judge
Eastern District of Oklahoma